DAVID W. McKEAGUE, Circuit Judge,
dissenting.
I respectfully dissent. Unlike the majority, I believe that we lack jurisdiction to review the Board’s denial of the Mandeb-vus’ asylum applications. And while I do not make light of the Mandebvus’ situation, I also believe, given the deferential standard of review, that the Mandebvus have failed to qualify for withholding of removal under the INA as well as relief under the CAT.
I.
First the Mandebvus contest the denial of their asylum applications. Our jurisdiction to review untimely asylum applications like the Mandebvus’ is statutorily limited. See 8 U.S.C. § 1158(a)(3). We only have jurisdiction to review such applications “when the appeal seeks review of constitutional claims or matters of statutory construction, not when the question is discretionary or factual.” Khozhaynova v. Holder, 641 F.3d 187, 191 (6th Cir.2011) (quoting Shkulaku-Purballori v. Mukasey, 514 F.3d 499, 502 (6th Cir.2007)). The Mandebvus argued that “changed circumstances” in Zimbabwe excused their late filing, but the IJ and the Board disagreed. See 8 U.S.C. § 1158(a)(2)(D). Notably, “ ‘the existence of ‘changed circumstances’ that materially affect eligibility for asylum is a predominantly factual determination, which will invariably turn on the facts of a given case.’ ” Almuhtaseb v. Gonzales, 453 F.3d 743, 748 (6th Cir.2006) (quoting Ramadan v. Gonzales, 427 F.3d 1218, 1221-22 (9th Cir.2005)).
Applying that standard here, it is clear that the IJ’s “incremental change” determination is a factual finding that this court lacks jurisdiction to review. See Khozhaynova, 641 F.3d at 191. The IJ did not state that an incremental change in country conditions could never constitute changed circumstances within the meaning of the statute; the IJ simply noted that “[cjhanged circumstances have to be a change in circumstance that materially affects the asylum eligibility of the individuals involved.” A.R. at 100 (emphasis added). This is squarely in line with the statute, which excuses late filing when an *435 applicant can demonstrate “changed circumstances which materially affect the applicant’s eligibility for asylum[.]” 8 U.S.C. § 1158(a)(2)(D) (emphasis added). Assessing the facts of this case, the IJ determined that the “events following the 2000 elections, while they did result in an incremental change in the conditions in Zimbabwe, certainly, in the judgment of the Court, are not a change that materially affects the eligibility of these two individuals for asylum.” A.R. at 100 (emphasis added). The Mandebvus’ argument is not one involving an issue of statutory construction — it is a direct challenge to the IJ and Board’s factual determinations that the changed conditions in Zimbabwe did not materially affect the Mandebvus’ eligibility for asylum.
I do not agree with the majority that either the IJ or the Board assumed that an incremental change was categorically insufficient to support a finding of changed country conditions. The IJ considered the factual evidence presented by the Mandeb-vus, yét “d[id] not see that as a change in country conditions that materially affects the eligibility of these respondents for asylum.” A.R. at 100-01 (emphasis added). Similarly, the Board examined the facts presented in the Zimbabwe Country Report and also found that the Mandebvus did not establish “a change in circumstances ... [that justified] the delayed filing.” A.R. at 4. The issue here is not whether incremental changes in a country could ever constitute changed circumstances, but whether conditions in Zimbabwe deteriorated to the point where they had a material effect on the Mandebvus’ eligibility for asylum. Both the IJ and the Board found that they did not. This is a contested factual determination about the nature of ongoing violence that we are without jurisdiction to review. See Al-muhtaseb, 453 F.3d at 748. (“Because [the applicant’s] claim relies on contesting ... factual determinations rather than on statutory construction or a constitutional claim, we are without jurisdiction to review the Board’s determination denying her asylum.”). I would therefore dismiss this part of their petition.
II.
The Mandebvus next contest the IJ and Board’s denial of withholding of removal under the INA. The Mandebvus bore the burden of demonstrating that it was “more likely than not” that they would be persecuted on the basis of their political opinions if they returned to Zimbabwe. See 8 C.F.R. § 1208.16(b)(2); Khozhaynova, 641 F.3d at 192-93 (discussing the clear probability standard). We review a denial of withholding of removal for substantial evidence, meaning we afford deference to the IJ and Board’s decisions and must affirm unless any reasonable adjudicator would be “compelled to conclude to the contrary.” 8 U.S.C. § 1252(b)(4)(B) (emphasis added); see also Stserba, 646 F.3d at 971-72 (observing that reversal is only appropriate if the decision was manifestly contrary to law). Because I believe that substantial evidence supports the IJ and Board’s findings, I would affirm.
At the onset, I disagree with the majority’s characterization of the IJ’s discussion of the Mandebvus’ political activism. The IJ acknowledged that some individuals associated with the opposition government had been beaten or killed, but the IJ stated that “according to both respondents, [the Mandebvus] were perceived as being both political and opposition political by those in power.” A.R. at 102 (emphasis added); see also Maj. Op. at 429 (discussing this statement). I would not rely on this statement as an indication that the IJ made a finding that this was in fact true, especially because the IJ’s observation *436 that the Mandebvus’ membership was “highly questionable” as well as other reasoning in the decision indicates the opposite. I note that the IJ carefully considered the Mandebvus’ specific conduct and reasoned, for example, that it was “really not clear from the evidence” why the ZANU-PF confiscated Mrs. Mandebvu’s cell phone at a roadblock one week after she attended a political rally, and that it could be “because they knew her, because they knew she was a teacher, or simply because she was in possession of a cell phone.” A.R. at 103.
While I agree with the majority that the Mandebvus presented evidence that some individuals who expressed opposition to the ZANU-PF were targeted for abuse, I cannot ignore that other individuals who expressed opposition to the ZANU-PF were not targeted for abuse. As the majority notes, Dr. Kaswoswe, a witness for the Mandebvus, was not persecuted upon his return to Zimbabwe despite the fact that he was far more politically active than the Mandebvus, carried an opposition party card, interviewed opposition party members, conducted dissertation research critical of the government, and admitted that he was a member of the opposition party. Dr. Kaswoswe’s safe return to Zimbabwe, particularly in light of how he demonstrated his political opposition to the ZANU-PF more brazenly than the Mandebvus, supports the IJ’s conclusion that the Man-debvus failed to show that they would “more likely than not” face persecution. It is not the only conclusion that can be derived from the evidence, but that alone does not make this conclusion unreasonable. In light of the deferential standard of review, that is enough to warrant affir-mance.
The majority seems to suggest that the IJ concluded that the evidence was insufficient simply because the Mandebvus did not hold leadership positions in the opposition party. While the IJ did “note” this fact, the IJ’s conclusion was clearly the product of a careful weighing of the evidence, which is made obvious by reviewing the IJ’s reasoning in full:
If the membership in the MDC makes a person such a magnet for abuse by the government, one would have expected that the doctor, or then doctoral candidate would have been a prime candidate when he was confronted by police in 2003. At least he would have been a candidate to have his research product confiscated and destroyed, arrested for some period of time. But none of those things happened, and he was not even threatened on account of his membership in the MDC.
Now, the supporting documents in this case do show that MDC members and other persons perceived as being in opposition to the government have been subjected to physical abuse by Zanu-PF, by the police and by others in government. They have been beaten. Some have been killed. The Court would note, however, that neither respondent in this case has ever held any sort of a leadership position or a high-profile role in the MDC either in Zimbabwe or in the United States. And, again, the Court finds their election to suddenly become a full-fledged, card-carrying member of the MDC only after being placed in proceedings, to be suspicious to the point of being almost humorous. Certainly either or both of the respondents could be perceived as being opposed to the government in power in Zimbabwe at this time and certainly the possibility exists that one or both of them would be arrested, detained, beaten or even killed.
That said, in the judgment of the Court the evidence is not sufficient in *437 this case to show that it is more likely than not, in other words that there is a clear probability, a 51 percent or better chance, that the life or freedom of either respondent would be threatened in Zimbabwe on account of their membership, either real or perceived, their membership in the MDC and as a consequence the perception that they are opposition, they form a part of the opposition to the government in power.
A.R. at 106-07 (emphasis added). It is clear to me that while the IJ recognized that the possibility of persecution on the basis of membership alone existed, the IJ concluded that the evidence was insufficient to meet the “more likely than not” standard. I cannot say that the evidence compels a contrary conclusion, and so I would affirm.
III.
The Mandebvus lastly contest the IJ and Board’s denial of withholding of removal under the CAT. In order to meet their burden, the Mandebvus “must ‘establish that it is more likely than not that [they] would be tortured if removed to the proposed country of removal.’ ” Dugboe v. Holder, 644 F.3d 462, 472 (6th Cir.2011) (quoting 8 C.F.R. § 208.16(a)(2)). This requires the applicant to establish a “particularized threat of torture.” Castellano-Chacon v. INS, 341 F.3d 533, 551 (6th Cir.2003). “Torture” means:
[A]ny act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.
8 C.F.R. § 1208.18(a)(1). An act of torture “must be specifically intended to inflict severe physical or mental pain or suffering,” 8 C.F.R. § 1208.18(a)(5), and “must be directed against a person in the offender’s custody or physical control.” Id. at § 1208.18(a)(6). We review the finding below for substantial evidence, see Bonilla-Morales v. Holder, 607 F.3d 1132, 1139-1140 (6th Cir.2010), and must affirm unless any reasonable adjudicator would be “compelled to conclude to the contrary.” 8 U.S.C. § 1252(b)(4)(B) (emphasis added).
The Mandebvus argue that they qualify for CAT relief because “they have relatives who have been tortured,” “torture camps were set up in Zimbabwe,” “[t]he government engages in torture,” and the “police and security forces engage[] in torture.” Accordingly, the Mandebvus allege, they are more likely than not going to be tortured. In light of the record, I cannot say that the evidence is sufficiently compelling so as to overturn the finding below. The Mandebvus have simply not established, given the substantial evidence standard of review, that it is more likely than not that they will be tortured if they return to Zimbabwe.[1] They have not personally *438 been subject to torture in the past, and the evidence that other members of the Man-debvu family have been harassed or assaulted is not sufficient to establish that the Mandebvus themselves will more likely than not be tortured. Further, we have recognized that even if a petitioner establishes that a particular group of which he or she is a member has suffered torture, that is not sufficient to show it is more likely than not that the petitioner would be subject to such treatment. See Almuhta-seb, 453 F.3d at 751 (statements that Israelis have tortured Palestinians in the past, even if taken at face value, did not show petitioner would be subject to torture). Accordingly, evidence that the police or security forces sometimes engage in torture, even torture of MDC members and supporters, is not enough to show that the Mandebvus will more likely than not be subject to torture. Because I cannot say that the evidence compels a contrary conclusion, I would affirm.
IV.
Because I believe that we are without jurisdiction to review the denial of the Mandebvus’ asylum applications, I would DISMISS that part of their petition. Further, because the Mandebvus failed to show that they will “more likely than not” face persecution or torture if they return to Zimbabwe, I would AFFIRM the decision of the BIA to deny withholding of removal under the INA and the CAT.

. The majority states that the Board did not discuss the conditions discussed in the Country Report before concluding that the evidence did not show that it was more likely than not that the Mandebvus would be tortured if they returned to Zimbabwe. But the Board reasoned as follows:
Before and after the 2008 elections, the Country Reports state that the government engaged in pervasive and systematic abuse of human rights. We further find, as did the Immigration Judge, that the respondent failed to establish either a change in cir *438 cumstances in Zimbabwe or extraordinary circumstances justifying the delayed filing.
A.R. at 4 (emphasis added). In light of the fact that the Board expressly considered the Country Report, I do not agree that the Board's decision does not indicate that it considered this evidence.